# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

FRANKLIN CHARLES HERNS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0109**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 22 CR 148

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova,* Mahoning County Prosecutor*, Atty. Edward A. Czopur,* Assistant Mahoning County Prosecutor, for Plaintiff-Appellee and

*Atty. Louis M. Defabio,* for Defendant-Appellant.

Dated:  December 21, 2023

**Robb, J.**

{¶1}  Appellant, Franklin C. Herns, appeals the judgment convicting him of one count of rape in violation of R.C. 2907.02(A)(2) and (B), a first-degree felony, sentencing him to a minimum of 11 years and up to 16.5 years maximum in prison, and ordering him to register as a Tier III sex offender and serve five years mandatory post-release control.

{¶2}  Appellant argues the trial court erred by allowing improper trial testimony; he was denied a fair trial based on prosecutorial misconduct during trial; and he was denied the constitutional right to a jury.  For the following reasons, we affirm.

<u>Statement of the Case</u>

{¶3}  In March of 2022, Appellant was indicted and charged with two counts of rape involving the same victim.  Appellant was appointed counsel, entered a not guilty plea, and was ordered to have no contact with the victim.  (April 7, 2022 Judgment.)

{¶4}  After the exchange of discovery and several Covid-19 related continuances, the case was heard at a jury trial commencing September 26, 2022.

{¶5}  The jury returned its verdict on September 29, 2022 and found Appellant guilty of one count of rape and not guilty of the other.  (September 30, 2022 Judgment.) Appellant was sentenced at a hearing on October 6, 2022.  (October 7, 2022 Judgment.) Appellant filed the instant appeal on October 17, 2022.

{¶6}  During opening, the state alleged the evidence would establish Appellant anally, orally, and vaginally raped the victim.  (Trial Tr. 298.)

{¶7}  The defense alleged during its opening statement the victim willingly had sexual relations with Appellant, but because she was trying to turn her life around, she accused Appellant of raping her.  She was upset with him since he lured her into having sex with him.  In addition, because she lived with the father of her children at the time, she needed a story to cover for her absence that day when she was supposed to be cleaning her home in preparation for their child's birthday party.  The defense contended her story that Appellant held her against her will for four hours while she had her cellular phone in her possession and was only .1 miles from her home is not credible.  (Trial Tr. 301-308.)

{¶8} The victim T.R. testified first. She was 29 years old at the time and had three children under the age of eight. She lived with her children and her children's father, Demetrius Dembert, at the time of the offense. The two were no longer in a romantic relationship with one another and lived together for convenience.

{¶9} T.R. explained she and Appellant were "talking with one another" in approximately 2017 while they both attended Youngstown State University. They were not exclusive. They dated for approximately one or two months. During this time, she had sex with Appellant about two or three times. T.R. had also known him before, explaining she attended eighth grade with Appellant. According to T.R., their relationship ended because Appellant wanted to date the mother of his children and T.R. at the same time, and T.R. did not agree to that situation. She did not recall Appellant being violent or intimidating when they previously dated. (Trial Tr. 311-317.)

{¶10} Days before the incident, T.R. initiated contact with Appellant via Facebook Messenger. He propositioned her for sex, and she declined indicating that she was looking for a committed relationship and father figure for her children.

{¶11} On the date of the offense, Appellant messaged T.R. and indicated he was coming to her home. The messages began that day with Appellant messaging T.R. at 5:01 A.M. saying, "Wake up." At 11:56 A.M. that same day, the two began a dialogue which ended with Appellant picking T.R. up from her home.

{¶12} During her testimony, she explained Appellant knocked on the window of her home, and she sent him away. He messaged her again and then said he was going to come back in five minutes. In one message Appellant stated: "im tryna suck on yo clit." T.R. responded to this message stating: "I'm not having sex" with four crying emojis. When Appellant came back a second time that day, T.R. left with him. She left home in her nightgown, underwear, and had no bra on at the time. She explained during her testimony that she had no intent on going with him that day. She did not tell her household members she was leaving because she only thought she would be gone about five minutes and they would drive around the block a few times. She wanted someone to talk with, and did not think she would be gone long. (Trial Tr. 318-353; State's Ex. 1.)

{¶13} Appellant was driving a van and initially told T.R. to get in the back, but she did not. They drove to a gas station where he purchased two bottles of wine. He then

drove to his house, which was nearby. She said his house was deplorable and smelled like dog. He had a pit bull, and T.R. is afraid of dogs. She said she went upstairs with Appellant in part to avoid the dog. She believed his mother lived there at the time as well. T.R. sat on a chair in his bedroom, and Appellant sat on a mattress which was on the floor. They talked and had a normal conversation for about 15 to 20 minutes. (Trial Tr. 354-361.)

{¶14} Appellant then attempted to become intimate with her. She is 4'10" tall and he is about six feet tall. She resisted, but he easily overpowered her. She was asked on direct examination:

Q. And what did he do to initiate that?

A. He was like pulling me over to the bed with him, but I'm like I'm fine right here. But he is stronger than me, so he got me onto the bed with him.

Q Okay. And what did he then do when you were on the bed with him?

A. Just trying to like pry my legs open, get my underwear off. And I'm trying like to push him off me.

* * *

A. I remember saying, please, I really, really don't want to have sex right now.

* * *

A. He's able to get himself between my legs and my underwear off and penetrate his penis.

(Trial Tr. 362-363.)

{¶15} When she indicated she did not want to have sex, he kept telling her to "shut the fuck up." (Tr. 364.) After the vaginal penetration, she stood up thinking he would let her leave. Instead, he "grabbed my arm and literally threw me back into the room." (Tr. 365.) She initially tried to resist before giving up because he covered her mouth and told her to stop yelling. She did not think she was going to get out of his house alive. She said he repeatedly strangled her. T.R. said she has asthma and could not breathe. She described how he was covering her mouth and nose and explained, "it seemed like he was like experimenting to see how long I could go without breathing."

Case No. 22 MA 0109

{¶16} At a certain point, she stopped fighting him because she thought submitting would end the situation. She said she was praying out loud and thinking she would never see her children again. The assault lasted about four hours. She said he vaginally and anally raped her multiple times. He also forced her to perform oral sex on him multiple times. Toward the end, Appellant told her she "needed that." He drove her home and had her sit in the backseat. (Tr. 366-372.)

{¶17} She said that when she got home, she broke down at the sight of her children because she did not think she would ever see them again. She was gone about four hours. The father of her children was there as well. She told him what happened, and he told her to call 911. The police and ambulance came.

{¶18} The 911 call was played at trial. T.R. told the operator she had been "raped over and over again." She said Appellant raped her, and he forced her to drink liquor. She said he would not let her go for hours. She said he was pulling her hair, and she could not breath. She described the color of his house and said it was deplorable, and then said, "I should've known." She was crying. She also said, "I thought we were going to have a conversation." She told the operator she had left her underwear at his house and he would not let her use the bathroom. (State's Ex. 2.)

{¶19} T.R. also testified that Appellant messaged her again after he dropped her off stating "you know I care." She blocked him after that. (Trial Tr. 378.) He also came to her door a few weeks later. She did not answer it, but called the police. Dembert argued with him outside. (Trial Tr. 379.)

{¶20} During cross-examination of T.R., she explained that she had been trying to drink less alcohol. She said she was in recovery, but she later testified she had been drinking on the date of the offense before she left home with Appellant. She then explained she had been drinking less than before, but said she was still drinking, not just every day. She drank "half a bottle of cheap wine" before she left with Appellant on the date of the offense. (Trial Tr. 405-406, 437.) When asked why she went with him when he wanted to have sex, she said, "I knew that's what he wanted, but I thought we were friends, so I didn't think he'd take it from me." (Trial Tr. 431.)

{¶21} T.R. agreed on cross-examination that she lied to the detective about Dembert staying with her because she did not want to lose her home. She was receiving

housing assistance through a domestic violence program and had entered an agreement stating he would not be living with her. (Trial Tr. 447.)

**{¶22}** T.R. also explained that she did not feel like one of the two officers who responded to her 911 call believed her story. She could tell he thought she was lying based on the way he was speaking to her. She said he "tried to insinuate that the situation was different than what I was saying it was. And so, I kind of just shut down from that officer because it seemed like he didn't believe me anyway." (Trial Tr. 452.)

**{¶23}** Dembert, the father of T.R.'s three children testified. He explained he and T.R. were no longer in a romantic relationship, but they co-parented the children. He lived with her to help with their kids. On the date of the incident, Dembert was asleep when she left. She did not tell him she was leaving or where she was going. She did not respond to his calls or texts. She finally returned home about 6 p.m. He said she was distraught and shaking. Dembert recalled that she looked "like she had seen a ghost." She told him she had been raped. (Trial Tr. 478-479.)

**{¶24}** T.R. called 911 and Youngstown Police Department Patrol Officer Darrick Ball was the first of two officers to arrive. He conducted T.R.'s initial interview before she left in an ambulance. When Ball arrived, she was shaking and crying. He described her as hesitant and afraid. Ball said he believed T.R. and her complaint seemed legitimate. He did not see any physical markings, injuries, bruising, or bleeding on her. Ball did not see any marks on her neck. (Trial Tr. 501-504.)

**{¶25}** Youngstown Police Department Commander of Special Victim's Unit Jessica Shields also interviewed T.R. and investigated the case. Shields attempted to contact Appellant at least 10 times. She went to his house and messaged him on Facebook. She eventually tracked Appellant down and secured his DNA per a warrant. Appellant informed her he was homeless, so she had animal charities secure the dog from inside the home. Shields described his home as deplorable. She smelled urine and feces from the outside of the home. The side door was broken, and the home was open. (Trial Tr. 537-546.)

**{¶26}** Shields agreed that T.R. had lied to them about Dembert living with her because T.R. thought she would lose her house. Shields was asked if she believed T.R., and she said she did. During Shields' testimony, she described that Officer Medvec, the

other initial investigating officer did not believe T.R.'s allegation. Medvec had told Shields he did not believe T.R. She was then asked about the report by Medvec, who did not believe T.R.'s story. Shields testified, "I feel that was uncalled for, and his wording of the report was inappropriate, but he made a judgment right away that, no, this didn't happen." (Trial Tr. 553-561.)

**{¶27}** Medvec was not called to testify by either side, and his referenced report was not introduced as an exhibit.

**{¶28}** David Miller, a forensic scientist in the DNA unit with the Ohio Bureau of Criminal Investigations, testified about the sexual assault kit test results. He confirmed that three of the swabs taken from T.R. showed two DNA contributors. One of the contributors was consistent with T.R. and the other was consistent with Appellant's DNA. Miller stated, "the estimated frequency of occurrence of that DNA profile was rarer than 1 in 1 trillion unrelated individuals." (Trial Tr. 519-525.)

**{¶29}** Heather Bayless, the nurse practitioner who examined T.R. on the date of the incident, also testified. At the beginning of her testimony, she was asked if she remembered T.R. She said yes and stated, "you just have those patients that kind of just tug at your heart that you remember them. * * * They leave an imprint." (Trial Tr. 570.) Defense counsel objected to her statement, but it was overruled. After being told to proceed by the court, Bayless said she has seen thousands of patients. Bayless also stated she has performed more than 100 sexual assault assessments, and she sees about 35 patients per day. She also stated: "But there's those specific patients that will leave an imprint on your heart, and it's because of either the trauma that they went through -- I remember my very first pediatric trauma victim who did pass away. I remember the day of the five children that died in the house fire. Those are things that you do not forget." (Trial Tr. 570.)

**{¶30}** According to Bayless, when T.R. arrived, she had a frozen or "flat affect" emotionally, which indicated she was in a state of shock. Bayless took the history of what happened, according to T.R. Bayless said T.R. felt comfortable going with Appellant to his home since she had been there before and his mother lived there. T.R. told Bayless they talked for quite some time before Appellant "switched and became very aggressive." T.R. told her it was not consensual sex. T.R. had said no, but was afraid, and he was

threatening her. Appellant had told T.R. that if she kept talking, it would "not end well for her." When T.R. told Appellant she needed to use the bathroom, he told her to go to the bathroom on the mattress. T.R. told Bayless that when the abuse finally stopped, Appellant began rambling and told T.R. he loved her. When she got home, she hugged her children, told their father what happened, and called 911. (Trial Tr. 563-579.)

{¶31} Bayless agreed T.R. had no physical injuries, including no signs of strangulation, and no damage to her vaginal or anal regions. Bayless also said this is not unusual. T.R. did complain about soreness. T.R. was very emotional and crying. Bayless also recalled that T.R. explained she had been drinking less often, and although she did not stop drinking altogether, she was drinking fewer times per week. (Trial Tr. 578-593.) Bayless was asked on redirect whether she believed T.R.'s story, and she said yes. (Trial Tr. 604.)

{¶32} Appellant testified on his own behalf. He said that he and T.R.'s prior relationship ended in part because she drank too much. He said her drinking was a "turnoff."

{¶33} On the date of the incident, Appellant said T.R. willingly went upstairs with him and sat on his bed. They talked for about 1.5 to 2 hours before having consensual sex. He promised he would help her financially and believes she was angry when he did not give her as much money as she expected. She complained it was not enough. Appellant said T.R. was already drinking that day before he picked her up. His bedroom window was open during the encounter, and his neighbors were outside. (Trial Tr. 617-650.)

{¶34} At the close of evidence, the jury asked a few questions, one of which was: "Why wasn't Officer Medvec a witness?" The trial court judge advised the jury he could not answer this question, but informed them to rely only on the evidence presented and directed the jury not to speculate. (Trial Tr. 736.)

{¶35} The jury found Appellant not guilty of the first count of rape, but guilty of the second rape offense. Appellant raises three assignments of error.

First Assignment of Error: Nurse's Testimony Invoking Sympathy

{¶36} Appellant's first assigned error asserts:

"The trial court abused its discretion and erred in admitting testimony, over objection, from the SANE nurse that treating [the victim] had left an imprint on her heart and affected her emotionally, as said testimony was irrelevant, prejudicial and highly inflammatory."

**{¶37}** Appellant claims the trial court should have excluded the nurse's testimony in which she said T.R. "tugged at her heart" and left an imprint on her. As stated, she testified on direct:

Q  Do you specifically remember this patient?

A I did, yes.

Q And why do you specifically remember her?

A You just have those patients that kind of just tug at your heart that you just remember them.

(Trial Tr. 570.)

**{¶38}** After the defense objection was overruled, the court stated: "Go ahead." This prompted Bayless to continue her thought, stating:

I mean, I probably take care of 35 patients a day. I work anywhere from 200 hours a month alone in the emergency department, so I've seen thousands. But there's those specific patients that will leave an imprint on your heart, and it's because of either the trauma that they went through -- I remember my very first pediatric trauma victim who did pass away. I remember the day of the five children that died in the house fire. Those are things that you do not forget.

(Trial Tr. 570.)

**{¶39}** Appellant claims Bayless' testimony as to *why* she remembered T.R. was irrelevant, immaterial to guilt, and was highly prejudicial. He claims the court should have excluded her statement as violative of Evid.R. 403(A) since it improperly aroused the jurors' emotions and sympathy toward T.R. Appellant claims his conviction must now be reversed. He also claims Bayless' testimony in this regard is improper victim-impact testimony.

**{¶40}** Trial courts have broad discretion in admitting evidence. We review decisions regarding the admission of evidence for an abuse of discretion, and must not

disturb a trial court's decision unless there is an abuse of discretion and the defendant has been materially prejudiced by the admission. *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

**{¶41}** To the extent Appellant claims Bayless' testimony was improper victim-impact evidence, we disagree. Victim-impact evidence is evidence introduced during the penalty phase of a death-penalty case. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 113. Furthermore, victim-impact evidence is evidence that relates "to the victim's personal characteristics and the impact that the crimes had on the victim's family." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 259; and *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597 (1991). Because this is not a death-penalty case and is not testimony about the impact on T.R.'s family, Appellant's argument that this is improper victim-impact evidence lacks merit.

**{¶42}** Appellant's other contention is that Bayless' testimony was highly inflammatory and prejudicial. Evid.R. 403(A) states: "Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

> Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.

*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000).

**{¶43}** As alleged, Bayless' testimony likely did appeal to the jurors' sympathies, but it was not unfairly prejudicial. Bayless was relaying T.R.'s narrative of the events, including how she was repeatedly raped and threatened. This testimony was not improper and not unfairly prejudicial since this case involved allegations that Appellant held T.R. against her will and repeatedly raped her. The allegations alone invoke emotional sympathies. The state was attempting to elicit testimony about T.R.'s condition

after the offenses to show she was in shock when Bayless compared T.R. to her prior patients.

**{¶44}** The prosecutor asked in her follow-up question, "What was [T.R.'s] demeanor like when you first encountered her?" This question elicited Bayless' testimony about T.R.'s observable condition on the date of the offense. The state was attempting to elicit testimony showing that based on Bayless' experience, T.R.'s demeanor was consistent with a person who was in shock.

**{¶45}** Bayless' description of T.R.'s condition and her perception of T.R.'s condition were relevant and not unfairly prejudicial since Bayless was describing the victim on the date of the offense. Had T.R. been playing tag with her children in the waiting room, this would have been equally relevant evidence about her condition on the date of the offenses. The victim's physical and emotional condition on the date of the offense were relevant and proper since it tends to establish that T.R. was raped consistent with the charges against Appellant.

**{¶46}** Appellant's counsel objected to Bayless' testimony that she remembered T.R. because she appeared traumatized and she "tugged at her heart." Her testimony in this regard, was relevant to show T.R.'s condition on the date of the offense and not unfairly prejudicial. "Evidence relating to the facts attendant to the offense * * * is clearly admissible * * *." *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

**{¶47}** Bayless described how T.R.'s disposition changed during the exam. Her flat or frozen affect, indicating shock, changed when Bayless initiated the physical examination of T.R.'s vaginal and rectal areas. At this point, T.R. became very emotional and was crying. (Trial Tr. 585-586.)

**{¶48}** In light of the foregoing, we conclude Bayless' objected to testimony, including her statement that T.R. left an imprint on her and "tugged at her heart" were not unfairly prejudicial and did not affect the fairness of the proceeding.

**{¶49}** However, Bayless' references to children dying and Bayless' implication that treating patients involved in those events impacted Bayless in a comparable way may have improperly appealed to the jurors' emotions. After the defense objection was overruled, Bayless made these additional statements. Yet, her statements in this regard were not objected to and were not in response to a question by the state, but were

seemingly spontaneous. Because this was not objected to testimony, it is subject to plain error review. Appellate courts should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶50}** Because Appellant has not shown the outcome would have been different absent Bayless' statements in this regard, we do not find plain error. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). This assigned error is overruled.

<u>Second Assignment of Error: Improper Vouching</u>

**{¶51}** Appellant's second assignment asserts:

"The Appellant was denied a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10 and 16 of the Ohio Constitution, due to repeated instances of prosecutorial misconduct, including having police officers and the SANE nurse vouch for the credibility and truthfulness of [the victim], and for using an improper argument during closing arguments."

**{¶52}** Appellant divides this assignment into four sub-arguments. First and second, he claims improper vouching by the state's witnesses encroached the province of the jury and is plain error warranting reversal. Third, Appellant contends his trial attorney's failure to object to this testimony is ineffective assistance of trial counsel. And last, Appellant claims the prosecutor's closing remarks improperly appealed to the jury's emotions and deprived him of a fair trial.

**{¶53}** We address Appellant's first two sub-arguments together. As alleged, Commander Shields testified she believed T.R., but she also was asked about Officer Medvec's report and the fact that he did not believe T.R. Nurse Practitioner Bayless testified she believed T.R.'s story, and Officer Ball also stated he believed T.R. As stated, Appellant did not object to any of this testimony.

**{¶54}** Because there was no objection, Appellant waives all but plain error. Appellate courts may notice "[p]lain errors or defects affecting substantial rights * * * although they were not brought to the attention of the [trial] court." Crim. R. 52(B). Appellate courts should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is an

obvious deviation from a legal rule that affects the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The appellant must show the outcome would have been different absent the plain error. *Id.*

**{¶55}** Appellant contends these three witnesses encroached the jury's function of determining T.R.'s veracity, and allowing such "vouching" or "bolstering" testimony is reversible error. He asserts the vouching was significantly troubling in light of the number of witnesses testifying as to the believability of T.R. and since two of them were police officers, who may be perceived as experts.

**{¶56}** The lead Ohio Supreme Court case on improper vouching, *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), generally held a witness may not testify as to their opinion of the veracity of the statements of a victim "because it is the fact-finder who bears the burden of assessing the credibility and veracity of witnesses." *Id.*

**{¶57}** *Boston* involved a child victim deemed incompetent to testify, but the child's doctor testified and stated the child had "not fantasized her abuse and that [the victim] had not been programmed to make accusations against her father." *Boston* was reversed and remanded for a new trial finding the pediatrician essentially testified the child "was truthful in her statements." *Id.* at 128. *Boston* further found this was "more than harmless," explaining:

> We have little difficulty in finding that the admission of this testimony was not only improper—it was egregious, prejudicial and constitutes reversible error. * * * [S]uch an opinion " * * * acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice[,] it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses."

*Id.* at 128-129, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988), Justice Brown, concurring.

**{¶58}** In *State v. Hensley*, 6th Dist. Lucas No. L-03-1005, 2005-Ohio-664, the Sixth Appellate District found plain error and ineffective assistance of trial counsel based on defense counsel's failure to object to a prejudicial question and answer directed to a police detective. The detective was asked whether he believed another suspect's

confession. He indicated he did not, and the state repeated this testimony in its closing remarks. *Id.* at ¶ 28-37. The *Hensley* court explained: "A review of the testimony * * * suggest[s] that appellant's trial counsel's failure to object to the improper question and answer was a matter of trial strategy * * *. Nevertheless, under the circumstances of this case, we must conclude that the admission of this evidence amounted to prejudicial error." *Id.* at ¶ 39.

**{¶59}** Standing alone, we agree the testimony of three separate witnesses stating they believed the victim and her story about being raped, constitutes error. This is particularly true when an investigating police officer expresses an opinion as to whether a witness is being truthful. *State v. Young,* 8th Dist. No. 79243, 2002-Ohio-2744, at ¶ 70-72. However, this court does not conclude this evidence rises to the level of plain error in light of the unique facts here.

**{¶60}** In a he-said, she-said case, the victim's credibility is paramount. And there can be no doubt that the outcome of this case turned on the credibility of witnesses and two competing versions of events—Appellant's version claiming consensual sex and T.R.'s version contending she was repeatedly raped during a four-hour period. The fact that three witnesses testified they believed T.R. alone could be an exceptional case where the outcome of the trial was affected. This is improper vouching testimony.

**{¶61}** In *State v. Huff*, 145 Ohio App.3d 555, 561, 763 N.E.2d 695 (1st Dist.2001), the First District Court of Appeals reversed a conviction, which it referred to as a "credibility contest," because a police officer testified he believed the victim. *Huff* concluded the testimony was wholly improper and trial counsel's deficient performance was sufficient to undermine confidence in the outcome of the trial. *Id.* at 562. The *Huff* court stated: "Because the trial court admitted blatantly inadmissible and prejudicial evidence, and because of lapses by defense counsel, we grant a new trial." *Id.* at 697.

**{¶62}** Since the decision in *Huff*, several courts have held that improper vouching as to a victim's credibility is harmless if the victim testifies and is subject to cross-examination. While having a witness testify the victim is telling the truth is error, it is harmless error if the victim testifies and is subject to cross-examination, there is medical evidence indicating abuse, and the testimony is cumulative to other evidence. *State v. Thompson*, 4th Dist. Washington No. 06CA28, 2007-Ohio-5419, ¶ 53; *accord State v.*

*Hupp*, 3rd Dist. Allen No. 1-08-21, 2009-Ohio-1912, ¶ 20. "When the victim testifies, the jury is able to hear the victim's answers, witness her demeanor and judge her credibility completely independent of the other's testimony concerning the veracity of the victim." *Id.*

**{¶63}** These courts rationalized that because the jury was able to perceive the witness and decide the credibility of the alleged victim for themselves, the improper vouching testimony was rendered harmless. *See State v. Smith*, 12th Dist. Butler No. CA2004-02-039, 2005-Ohio-63, ¶ 22-24; *State v. Morrison,* 9th Dist. Summit No. 21687, 2004-Ohio-2669, ¶ 62-66; *State v. Reid,* 8th Dist. Cuyahoga No. 83206, 2004-Ohio-2018, ¶ 35-36.

**{¶64}** Further, in *State v. Marcum*, 2022-Ohio-3576, 198 N.E.3d 599 (2nd Dist.), *appeal not allowed,* 170 Ohio St.3d 1442, 2023-Ohio-1830, 210 N.E.3d 551, the Second District found a paramedic's testimony he found the victim "very believable" plus the state's reliance on this bolstering testimony in its closing, did not rise to the level of plain error. *Marcum* explained courts must assess plain error from the whole of the trial to ascertain if the outcome was affected. *Id.* at ¶ 38.

**{¶65}** In *Marcum*, the court went through the evidence, including the fact that the victim testified in detail about the offenses and was subject to cross-examination, unlike the victim in *Boston,* above. The *Marcum* court also emphasized the jury's verdict finding Appellant not guilty of six of the nine charged offenses made it, "very clear that this was not a case in which the jury blindly followed the complaining witness's testimony." *Id.* at ¶ 44. Because the jury found him *not* guilty of certain charges, the court found the jury's role was not usurped. Instead, the verdict showed the jury independently discerned what it believed from the victim's testimony and what it believed from Marcum's version of the events. *Id.*

**{¶66}** In the instant case, it is probable the defense may not have objected to the "vouching" testimony because the defense intended to attack T.R.'s credibility via the use of similarly improper testimony. As stated, T.R. testified about how she could tell Medvec did not believe her allegations. Shields reiterated in her testimony that Medvec did not find T.R.'s story credible and that Medvec had used inappropriate wording in his report.

Further, it is reasonable to conclude the defense planned to elicit similar testimony from Medvec at trial.

**{¶67}** Medvec was subpoenaed by the state to appear and testify at trial. He was also included on the state's witness list. After a continuance, Medvec was again listed on a state subpoena in August of 2022. The defense also subpoenaed Medvec to testify in September of 2022. He was not, however, called by either party to testify at trial. Nevertheless, defense counsel did elicit testimony about Medvec's unfavorable report and that he did not find T.R. credible via testimony and argument.

**{¶68}** Furthermore, Shields agreed on cross-examination that T.R. had lied to the police about Dembert living with her because T.R. thought she would lose her housing assistance. As to Medvec, Shields stated: "[H]e pretty much relayed his personal opinion to me that he didn't believe her either. I feel that was uncalled for, and his wording of the report was inappropriate, but he made a judgment right away that, no, this didn't happen." (Trial Tr. 552-554.) Only after this line of questioning, was Shields asked on redirect examination by the state whether she believed T.R. Shields said she believed her.

**{¶69}** As for Bayless' testimony, the defense objected when it seemed the state was about to ask Bayless her opinion as to whether she believed T.R. had been raped. The trial court sustained the objection. Immediately thereafter, the state asked Bayless:

Q All right. So when you make your findings, do you take into consideration both the physical injuries as well as the statement that you get from the patient?
A Correct.
Q Okay. And after meeting with this patient, did you believe what she told you?
A Yes.

(Trial Tr. 604.) There was no objection to the foregoing.

**{¶70}** As for Ball, however, he was asked by the state on direct examination if he believed T.R. and whether she had made what he considered to be a "legitimate complaint." He answered yes to both questions with no objection. (Trial Tr. 504.)

**{¶71}** Thus, it appears the defense had opened the door and possibly did not object to the state witnesses' testimony about whether they believed T.R.'s claims because the defense planned to elicit the same type of evidence to disprove her credibility. For whatever reason, however, Medvec did not testify.

{¶72} Based upon *Boston* and its progeny, we conclude the bolstering testimony about the victim's veracity was improper.

{¶73} However, since the defense theory of the case was to show T.R. lacked credibility via similar vouching testimony, we find the error flowed from defense strategy. Further, like the facts in *Marcum*, the jury here returned a guilty verdict on one count, but found Appellant not guilty of the other. As in *Marcum*, this shows the jury did not blindly rely on the improper vouching testimony, but independently weighed the evidence and determined the witnesses' credibility. Moreover, as in *Thompson*, above, and *Hupp*, above, T.R. testified in detail about the allegations and was cross-examined, allowing the jury to independently determine her credibility.

{¶74} Upon the record before us, we find the outcome of the trial clearly would not have been different, and thus, there was no plain error.

{¶75} Accordingly, Appellant's first and second sub-arguments lack merit.

{¶76} Appellant's third sub-argument asserts ineffective assistance of trial counsel based on defense counsel's failure to object to this testimony. To establish a claim of ineffective assistance of counsel, a defendant must show both his trial counsel's performance was deficient, in that it fell below an objective standard of care, and the deficient performance resulted in prejudice. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). The burden is on the defendant to prove ineffectiveness of counsel. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

{¶77} Licensed attorneys in Ohio are presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential because of the strong presumption counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. In fact, appellate courts are prohibited from second-guessing trial counsel's strategic decisions. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶78} There is no doubt that Appellant's trial counsel's defense strategy was to discredit T.R.'s credibility. To achieve this, defense relied in part on the fact that one of the initial investigating officers was forthcoming about his belief that her allegations were

false. Although Officer Medvec did not eventually testify, he was on the witness list for both sides. Further, Commander Shields testified about Medvec's negative report during her testimony, and T.R. also relayed how she could tell he did not believe her story. Consequently, it seems likely the defense did not object to the state's "vouching" testimony because Appellant wanted to rely on similar testimony and evidence. Accordingly, we conclude Appellant's trial counsel's performance was not deficient, and as such, the first prong of the ineffective assistance of counsel test is not satisfied.

{¶79} Appellant's fourth sub-argument asserts his attorney's failure to object to the state's closing arguments, during which the state improperly appealed to the jury's emotions, constituted prosecutorial misconduct and denied him a fair trial.

{¶80} In determining whether prosecutorial misconduct has occurred, we must determine whether the comments or questions were improper and, if they were, whether they prejudiced Appellant's substantial rights. *State v. Treesh,* 90 Ohio St.3d 460, 480, 2001-Ohio-4, citing *State v. Lott,* 5 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). The benchmark is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 212, 102 S.Ct. 940 (1982).

{¶81} In closing, the defense urged the jury *not* to believe T.R.'s testimony. Defense counsel emphasized that T.R. lied about Dembert living with her and how she was texting Appellant about sex beforehand. The defense also highlighted that Officer Medvec did not believe her claim that she had been raped from the beginning. So, counsel argued after her initial interview, she added details and changed her story to make it more believable. (Trial Tr. 693-697.)

{¶82} In the state's rebuttal argument, the prosecutor acknowledged T.R. made bad decisions on the day of the incident and she had lied to protect her housing assistance. However, the state also reiterated how several witnesses, including the nurse and the detective found T.R.'s story credible. The state urged the jury to find T.R. lacked a motive to make up the rape allegations. (Trial Tr. 704-712.)

{¶83} There were no objections to the state's closing. Thereafter, as part of the jury instructions, the trial court advised: "Evidence does not include opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence. (Trial Tr. 715.)

Case No. 22 MA 0109

{¶84} It separately instructed the jury: "You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence." (Trial Tr. 717.)

{¶85} A failure to object during closing arguments is frequently part of trial strategy. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90. "A competent trial attorney might well eschew objecting * * * to minimize jury attention to the damaging material." *Id.*, quoting *United States v. Payne*, 741 F.2d 887, 891 (C.A.7, 1984). Further, "[n]ot every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d 107, 112, 559 N.E.2d 710 (1990).

{¶86} Here, it appears the state's comment and reliance on the "vouching testimony" was in response to the defense reference to Medvec's disbelief of T.R. While the testimony itself was likely improper, both sides relied on this type of generally improper vouching evidence to support their theory of the case. And while the law generally discourages and disallows evidence of this nature, upon viewing the trial as a whole, we cannot conclude the trial was unfair.

{¶87} Further, the jury was instructed that counsel's statements made during closing arguments were not evidence. And there is no reason to believe the jury did not follow the court's instruction that the jurors are the sole judges on the credibility of the witnesses. *State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2019-Ohio-1760, ¶ 10. We must presume the jury followed the trial court's instructions. *State v. Vunda*, 12th Dist. Butler No. CA2012-07-130, 2014-Ohio-3449, ¶ 68. The fourth sub-argument under this assignment lacks merit.

{¶88} Accordingly, this assigned error lacks merit in its entirety.

Third Assignment of Error: Unanimous Jury Verdict

"The Appellant was denied his right to a unanimous jury verdict as guaranteed by Crim.R. 31(A) and the Sixth and Fourteenth Amendments to the United States Constitution."

{¶89} Appellant contends the trial court erred by giving a jury instruction as to the definition of rape as including cunnilingus and also defining that term for the jury when there was no corresponding evidence or argument the defendant committed rape via cunnilingus. He claims this constitutes an improper alternative means instruction that

precluded necessary juror unanimity. Appellant asserts in multiple means cases, there must be evidence corresponding with each alternative means or the manner by which the offense was committed, and absent such evidence, a presumption of prejudice attaches, preventing plain error review.

**{¶90}** In support of his argument, Appellant claims the jury was confused about the instructions. They asked the court to explain the two counts after the instructions were given.

> THE COURT: We were also presented a question this morning: Could you explain the two counts? And the answer is no, I cannot explain the two counts. You're going to have to figure that one out. You have -- if you haven't -- do you have a copy of the instructions back here?
>
> UNIDENTIFIED JUROR: I believe we do, yes.
>
> THE COURT: You have to refer to the instructions. I left them with you. If you have any questions, hopefully that will help answer any questions that you have.

(Trial Tr. 736-737.)

**{¶91}** Because Appellant did not object to this instruction at trial, he has waived all but plain error. Crim.R. 30(A). As stated, appellate courts may notice "[p]lain errors or defects affecting substantial rights * * * although they were not brought to the attention of the [trial] court." Crim. R. 52(B). We, however, should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is an obvious deviation from a legal rule that affects the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The appellant must show the outcome would have been different absent the plain error. *Id.*

**{¶92}** The state counters this is not a multiple means case because the jury instruction which Appellant challenges goes to an element of the offense, not the offense itself.

**{¶93}** Appellant was charged and convicted of rape in violation of R.C. 2907.02(A)(2), a first-degree felony, which states: "No person shall engage in sexual

conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is defined as:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶94}** Both parties rely on *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, a plurality opinion. *Gardner* involved an aggravated burglary charge and conviction. To establish the offense of aggravated burglary, the state must establish, in part, that the defendant entered the home of another with the purpose to commit "any criminal offense" inside. *Id.* at ¶ 32. The jury in *Gardner* was not instructed on the underlying offense, and the facts of that case were such that it was unclear what the jury determined the underlying offense was. The court of appeals found plain error as the defendant was denied his due process right to juror unanimity about what the underlying offense was. The issue on appeal was "whether the jurors must agree unanimously as to which criminal offense a defendant intended to commit during a burglary." *Id.* at ¶ 37.

**{¶95}** Crim.R. 31(A) requires a jury verdict to be unanimous. However, *Gardner* reversed and held in part, "jurors need not agree to a single way by which an element is satisfied." *Gardner*, at ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707 (1999). In explaining its decision, *Gardner* referenced its prior decision involving this issue in a rape case in which the Supreme Court had rejected this argument:

> [I]n *State v. Thompson* (1987), 33 Ohio St.3d 1, 514 N.E.2d 407, an aggravated-murder case in which the state alleged that the murder had been committed in the course of rape * * *, we rejected the appellant's contention that in order to ensure a unanimous verdict, the trial court was required to instruct the jury that it needed to agree as to whether he had committed a vaginal rape, an anal rape, or both. *Id.* at 11, 514 N.E.2d 407.

We held that Ohio's rape statute required a showing of "sexual conduct" and that both vaginal intercourse and anal intercourse satisfied the statutory definition of "sexual conduct." We concluded that jurors needed to find only that sexual conduct had occurred in order to find the aggravating circumstance of rape and that because the statute did not require a specific finding as to the *type* of rape, the trial court did not err by refusing to instruct the jury that it must make that finding. *Id.*, 33 Ohio St.3d at 11, 514 N.E.2d 407. We concluded, "The fact that some jurors might have found that appellant committed one, but not the other, type of rape in no way reduces the reliability of appellant's conviction, because a finding of either type of conduct is sufficient to establish the fact of rape in Ohio." *Id.*

*Id.* at ¶ 43-44.

**{¶96}** The *Gardner* Court continued and explained:

Similarly, we do not require all jurors to agree whether a defendant raped a victim orally, vaginally, or anally, because all three constitute "sexual conduct" in violation of the rape statute. In such cases, there is no violation of the jury unanimity rule as long as all of the jurors agree that there was sufficient penetration to satisfy the "sexual conduct" element of the crime of rape. *Thompson,* 33 Ohio St.3d at 11, 514 N.E.2d 407.

*Id.* at ¶ 65.

**{¶97}** Here, Appellant was charged with two counts of rape. It was alleged, and corresponding evidence was presented, that Appellant raped T.R. orally, anally, and vaginally. Although we agree there was no evidence presented that Appellant committed rape via cunnilingus, the inclusion of an unnecessary definition was harmless since there was ample evidence by direct testimony that Appellant orally, anally, and vaginally raped T.R. There is a unanimous verdict that a rape occurred "because all three constitute 'sexual conduct' in violation of the rape statute." *Id.*

**{¶98}** Because notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice, we find no plain error here. *State v. Long*, 53 Ohio St.3d 91, 372 N.E.2d 804, 53 Ohio St.2d 91, paragraph three of the syllabus.

Case No. 22 MA 0109

**{¶99}** This assignment of error is overruled.

<u>Fourth Assignment of Error: Manifest Weight</u>

**{¶100}** Appellant's fourth and final assigned error asserts:

"The jury's verdict of Guilty was against the manifest weight of the evidence."

**{¶101}** A manifest weight review requires an appellate court to review the evidence and determine whether this is an exceptional case in which it is patently apparent the trier of fact lost its way. *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541 (1997).

> The * * * weight of the evidence addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? * * * [A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.' * * *.

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶102}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact "is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis,* 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18, citing *Iler v. Wright,* 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

**{¶103}** As stated, Appellant was convicted of count one, a violation of R.C. 2907.02(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

> "Sexual conduct" is defined as,
>
> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of

another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶104}** T.R. testified Appellant held her against her will and raped her orally, vaginally, and anally.  Her testimony is bolstered by her statements and conduct after the offenses.  She told Dembert what happened, called 911, and secured medical treatment.  Bayless believed T.R. was in shock when she saw her, and Dembert described her as if she had "seen a ghost."  Although there were issues with her credibility, including lying about whether Dembert was living with her and what she meant by being in "recovery" for alcoholism, those issues were vetted by the defense and were before the jury for it to address.

**{¶105}**  Credibility of witnesses is primarily for the finder of fact because the jury is best able to view the witnesses and observe their demeanor, including voice inflections and body language.  *Matter of Estate of McDaniel*, 2023-Ohio-1065, 212 N.E.3d 351, ¶ 41-42 (7th Dist.), citing *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 801, 461 N.E.2d 1273 (1984).

**{¶106}**  Appellant likewise testified and provided an alternative version of events that day.  The jury evidently believed T.R.'s testimony and did not believe Appellant's.  Because we do not find this is the exceptional case where the jury lost its way, we will not disturb the decision rendered by the jury.  This assignment of error lacks merit and is overruled.

Conclusion

**{¶107}**  Based on the foregoing, each of Appellant's assignments of error lack merit.  The trial court's decision is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 22 MA 0109

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**