[Cite as *State v. Quinn*, 2025-Ohio-1583.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                                    Court of Appeals No.  WD-24-020

      Appellee                                              Trial Court No. 2023 CR 0279

v.

Ivory Nicole Quinn                                          **DECISION AND JUDGMENT**

      Appellant                                              Decided: May 2, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Jeffrey P. Nunnari, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Ivory Quinn, appeals the January 29, 2024 judgment of the Wood County Court of Common Pleas, convicting her of aggravated vehicular homicide, falsification, operating a vehicle while under the influence of alcohol, and driving under suspension.  For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} Ivory Quinn was charged in a five-count indictment with the following offenses: (1) aggravated vehicular homicide, a violation of R.C. 2903.06(A)(1)(a) and (B)(2)(b)(i), a first-degree felony (Count 1); (2) aggravated vehicular homicide, a violation of R.C. 2903.06(A)(2)(a) and (B)(3), a second-degree felony (Count 2); (3) falsification, a violation of R.C. 2921.13(A)(3) and 2921.13(F)(1), a first-degree misdemeanor (Count 3); (4) operating a vehicle while under the influence of alcohol, a violation of R.C. 4511.19(A)(1)(a) and (G)(1)(c), an unclassified misdemeanor (Count 4); and (5) driving under suspension, a violation of R.C. 4510.11(A) and (D)(1), a first-degree misdemeanor (Count 5). Quinn's co-defendant, Sonya Kinney, was charged with the same offenses, plus an additional charge for operating a vehicle with a prohibited alcohol concentration, a violation of R.C. 4511.19(A)(1)(d) and (G)(1)(a), a misdemeanor of the first degree. These charges stemmed from a motor vehicle accident that occurred on December 3, 2022, and caused the death of B.H.

{¶ 3} The matter was tried to a jury beginning January 10, 2024. The State presented the testimony of P.M., a motorist who witnessed the accident; Ohio State Highway Patrol Trooper Christopher Kiefer and Sergeant Garrett Lawson, both of whom responded to the accident; Edward Yingling, a criminalist in the Highway Patrol's Columbus crime lab; Trooper Kyle Baxter, an accident reconstructionist; Robyn Shinaver, the chief toxicologist and laboratory director for the Lucas County Coroner's toxicology lab; and Thomas Blomquist, M.D., a forensic pathologist and deputy coroner in the Lucas County Coroner's Office. Numerous exhibits were admitted at trial,

2.

including photographs; reports from the reconstructionist, criminalist, toxicologist, and pathologist; written statements from Quinn and her co-defendant; and recordings from body worn cameras, dashboard cameras, and cameras located in the cabin of the Ohio State Highway Patrol vehicles.

### A. The evidence reveals how the accident occurred.

{¶ 4} According to the evidence presented at trial, on December 3, 2022, Quinn and Kinney, were traveling on northbound I-75 after getting off work at 10:00 p.m. Quinn was driving a Cadillac SUV and Kinney was the front-seat passenger. Both women had been drinking alcohol at work. At approximately milepost 171, for reasons she could not explain, Kinney grabbed the steering wheel while Quinn was driving 83 miles per hour in the center lane. Quinn was unable to right the vehicle, and it careened into the left lane and collided with the concrete barrier dividing northbound and southbound I-75. This rendered the vehicle inoperable.

{¶ 5} Quinn and Kinney abandoned the vehicle in the left lane with no hazard lights or headlights. Moments after exiting the vehicle, B.H. was driving her Ford sedan in the left lane at approximately 71 miles per hour. Her vehicle collided with the Cadillac. Shortly thereafter, a Toyota carrying Kinney's boyfriend and three of Quinn and Kinney's co-workers came along, traveling 75 miles per hour. The driver swerved to avoid either the vehicles or the debris. The Toyota spun and became pinned by the Ford against the concrete barrier.

{¶ 6} B.H. was pronounced dead at the scene. The autopsy revealed that she died from blunt force trauma caused by the accident.

3.

## B. Quinn and Kinney lie about how the accident occurred.

{¶ 7} Emergency personnel arrived to a chaotic scene. It was not immediately apparent how the crash occurred. The Cadillac was in the right lane. It had impact damage to both the front and rear of the vehicle, the airbags were deployed, the tires were deflated, it had leaked a large amount of fluid, and the rear windshield was broken out. The Ford had significant impact damage to the rear left side, engine compartment, front left panel, quarter panel wheel well, and driver's door. The airbags had deployed. The rear left door was torn from the vehicle. The Ford was situated perpendicularly to the Toyota, which was pressed against the concrete barrier dividing northbound and southbound I-75. The Toyota was facing southbound in the northbound lane. People were lying on the asphalt wrapped in blankets.

{¶ 8} While they were standing along the concrete divider, Trooper Kiefer spoke with Quinn and Kinney and attempted to get verbal statements. Quinn was quiet at first, but both she and Kinney reported that they were attempting to switch lanes when they were rear-ended by the Ford and forced into the concrete barrier. Kinney said they were in the right lane trying to go to the left. Quinn said they were in the left lane trying to go to the middle lane. But Quinn and Kinney both told Trooper Kiefer that their vehicle and the decedent's vehicle were moving at the time of the crash. They did not say that the Cadillac SUV was disabled and, in fact, Kinney stated there were no issues with their vehicle.

{¶ 9} It was extremely cold outside, and officers were still investigating the crash and needed to get Quinn and Kinney's statements, so officers placed Quinn and Kinney

4.

in the rear of Sergeant Lawson's police vehicle. Sergeant Lawson attempted to get a written statement from them, but they weren't providing much useful information. Quinn said that she couldn't write because her hands were cold and possibly injured. She passed the statement form to Kinney to write and they attempted to draft a statement together.

{¶ 10} Sergeant Lawson eventually took a statement in question-and-answer form, and wrote the information down himself. Quinn said they had just gotten off work at 10:00 p.m. at Teijin Automotive in North Baltimore. She was trying to get into the right lane when they were rear-ended by a quickly-approaching vehicle. Quinn estimated that she was traveling 70 to 80 miles per hour. She told Trooper Kiefer that she did not know what lane she was in when the collision occurred, she did not see headlights, and she did not know how fast the other vehicle was going. Quinn claimed that a couple of seconds before attempting the lane change, she activated her turn signal. She conceded that she was not wearing her seatbelt, but denied that she had consumed drugs or alcohol or that she was in any way distracted. Quinn stated that they knew the occupants of the Toyota because they worked together. She said she was injured a little around her wrist and hand.

{¶ 11} Quinn and Kinney's version of events did not seem consistent with the evidence at the scene. It was also not consistent with what was reported by a witness to the crash. That witness, P.M., told Trooper Kiefer that he and his wife and kids were travelling northbound in the middle lane of traffic when he saw a disabled Cadillac stopped in the left lane with no flashers or lights. He remarked, "oh shit, there's going to

5.

be an accident," but before he could do anything, the Ford driving next to him in the left lane hit the Cadillac. Upon the impact, P.M.'s windshield was showered with glass. He swerved hard, and when he glanced in the side mirror, he saw the Cadillac and the Ford spinning out. P.M. said that there was no time to react and if he had been in the left lane, he would have hit the disabled vehicle.

{¶ 12} P.M. stopped and backed up his vehicle, and his wife called 9-1-1. They ran to the Ford and encountered B.H. His wife stayed with B.H. and P.M. went to the Cadillac. He didn't see anyone. He went back to his truck to get a brighter flashlight, and when he returned, another man at the scene said, "I found [the occupants of the Cadillac], they're over here"— "way back like where the actual crash started." Quinn and Kinney were further down the road—away from the crash site—out of the vehicle and on the shoulder of the road.

{¶ 13} Sergeant Lawson left Quinn and Kinney alone in the back of his patrol car for several minutes. While still at the scene, he viewed footage of Quinn and Kinney's interaction in the patrol car. Kinney asked Quinn if she felt drunk. Quinn told her it didn't matter because Kinney had "fucked up [her] whole life." Kinney wondered if Quinn would blow over the legal limit. Quinn replied that she would. Quinn asked Kinney why she yanked the steering wheel. She said that it had sent the vehicle out of control and asked, "why did you do that?" Kinney responded that she didn't mean to do it and she didn't know why she did it. Quinn said, "all I know is you yanked the steering wheel and I couldn't control the fucking car[.]"

6.

{¶ 14} Someone transmitted over the police radio that the decision had been made to pronounce B.H. dead at the scene. Kinney was visibly distraught by this news, however, this did not prompt her or Quinn to provide officers with accurate information about how the accident occurred.

### C. Officers suspect alcohol use.

{¶ 15} While Quinn and Kinney were seated in the back seat of the patrol car, Sergeant Lawson noticed a strong odor of alcohol. He asked if they had been drinking. Kinney said that she drank approximately two hours earlier, but she wasn't driving. Quinn denied that she had been drinking. Sergeant Lawson and Trooper Kiefer decided to separate Quinn and Kinney so they could determine the source of the odor of alcohol.

{¶ 16} Kinney was taken to the back of Trooper Kiefer's patrol car. He noted a strong odor of alcohol emitting from Kinney's person and observed other potential indicators that she was impaired, including bloodshot, glassy eyes, and droopy eye lids. As for Quinn, the odor of alcohol did not dissipate when Kinney was removed from the vehicle. Sergeant Lawson also observed that Quinn had droopy eye lids and bloodshot eyes. Quinn took a portable breath test and registered a blood-alcohol concentration ("BAC") of 0.119.

### D. Quinn and Kinney are arrested and taken to the patrol post.

{¶ 17} Based on Trooper Kiefer and Sergeant Lawson's observations, they placed Quinn and Kinney in investigative detention. The women were ultimately arrested and transported to the patrol post.

7.

{¶ 18} Quinn was arrested for operating a vehicle while impaired and providing false statements to law enforcement. She was handcuffed and Mirandized. They transported her to the patrol post to complete a breath test, to finish the criminal charges, and to conduct further investigation. Quinn was stoic, but seemed a little confused about what was going on.

{¶ 19} On the ride to the patrol post, Quinn admitted consuming alcohol at work that night. She also stated that she and Kinney were trying to get their licenses back. At the post, Sergeant Lawson ran a records check for Quinn, which revealed that her license was under suspension and she had two prior OVI convictions—one from March 27, 2015, and one from December 16, 2016. Quinn stipulated to both of these facts at trial. The stipulation was read to the jury and admitted as an exhibit.

{¶ 20} Although she had taken a portable breathalyzer test, Quinn refused to take the official breath test on the Intoxilyzer 8000 machine. Given the severity of the crime and Quinn's prior record, the officers obtained a search warrant to do a forced blood draw at the hospital. Quinn's blood was drawn at Wood County Hospital on December 4, 2022, at 2:16 a.m.

{¶ 21} Quinn had a backpack with her at the scene of the accident. Sergeant Lawson placed it in the trunk of his patrol car and searched it after arresting Quinn. There was an almost-empty bottle of vodka in the backpack. Trooper Kiefer testified that based on the signs of impairment he observed—the strong odor of alcohol, droopy eye lids, bloodshot glassy eyes, and the manner of the crash—plus Quinn's admission to

8.

drinking alcohol, he ultimately deemed that alcohol had impaired her central nervous system.

{¶ 22} Sergeant Lawson also checked Kinney's record. He learned that Kinney's license was also under suspension. Kinney stipulated to this fact at trial. While at the post, Kinney agreed to submit to a breath test with the Intoxilyzer 8000 machine. At approximately 12:40 a.m.—two-and-a-half hours after the accident—she had a BAC of 0.102, above the legal limit for operating a motor vehicle. While Trooper Kiefer was transporting Quinn to the hospital, Sergeant Lawson spoke with Kinney. Kinney showed signs of alcohol impairment, including a strong odor of an alcoholic beverage, bloodshot glassy eyes, depressed nervous system, and lackadaisical demeanor.

{¶ 23} Trooper Keifer and Sergeant Lawson both testified that speed and marked-lanes violations are the most common traffic infractions committed by impaired drivers.

### E. Kinney is questioned at the station.

{¶ 24} Kinney was questioned at the police station after her arrest. She told Sergeant Lawson that she and Quinn left work at 10 p.m. and were on the road driving. She was the front right passenger. For reasons she could not explain, she touched the wheel "just a little bit though" and they spun out of control. Quinn tried to swerve to avoid hitting the dividing wall, but the car became disabled near the wall. There were no cars around, but no longer than a minute after they exited the vehicle, the decedent's vehicle came up fast and hit the back of their car. The impact pushed Quinn and Kinney's car 15 to 20 feet. Kinney claimed they didn't have time to put on the hazards.

9.

She denied that Quinn was on the phone. Kinney said that they were having a normal conversation and she didn't know what made her touch the wheel.

{¶ 25} Kinney stated that she consumed a little less than half a pint of Tequila, but this was before they got on the road. She did not know how much Quinn had to drink. Neither of them drank any alcohol after the crash. Kinney claimed that they had their seatbelts on. She did not know where the third car came from and claimed that she originally gave a different statement because of the shock of it all and because she was scared because they both had been drinking. After the crash, Quinn was "pretty fucking pissed" and asked why Kinney "would do that." Kinney told her that she didn't know why. Kinney said that she tried to restart the car to get it out of the road, but it wouldn't start, and that's when the decedent's car came "really fast."

{¶ 26} Sergeant Lawson did not believe that Kinney touched the wheel "just a little bit" because touching the wheel "just a little bit" would not have caused it to careen out of control. The rest of what Kinney said—about crashing into the concrete barrier— was consistent with the front-end damage to the Cadillac, and the second collision was consistent with the rear damage to the Cadillac.

{¶ 27} Trooper Kiefer confirmed that it is not illegal for a passenger to have consumed alcohol. He did not know whether Kinney was ever in the driver's seat or whether she ever had her foot on the gas pedal or the brake pedal of the vehicle. But Trooper Kiefer's view was that it is illegal for an impaired passenger to jerk the steering wheel, causing movement of that vehicle. Both Trooper Kiefer and Sergeant Lawson

10.

testified that despite the fact that acceleration is also required, touching the wheel of a vehicle creates movement if it moves the steering wheel in any way.

### F. Experts determine that Quinn's BAC was over the legal limit.

{¶ 28} Edward Yingling works as a criminalist at the Highway Patrol's crime lab in Columbus, Ohio. Using gas chromatography, he analyzed Quinn's blood to determine the grams of alcohol per milliliter and prepared a report of his findings. He calculated a BAC of 0.094—above the per se limit of 0.08 for operating a motor vehicle within the State of Ohio.

{¶ 29} Robyn Shinaver is the chief toxicologist and laboratory director for the Lucas County Coroner's toxicology lab. Because Quinn's blood was drawn more than three hours after the accident, Shinaver was asked to perform a retrograde or back extrapolation—i.e., to back-calculate—Quinn's BAC at the time of the accident. Although there can be some variation between individuals, there is an established rate at which ethyl alcohol eliminates from the body, so it is possible to calculate what a BAC would have been at the time of the accident within a plus or minus deviation.

{¶ 30} Shinaver was provided a crime lab alcohol result of 0.094 grams and a crash date and time of December 3, 2022, at 22:11. The blood was collected December 4, 2022, at 2:16. An average of 0.15 percent is eliminated per hour. To account for individuals' variations in elimination rate, a deviation is used between 0.01 percent and 0.02 percent. Shinaver calculated that Quinn's blood-alcohol concentration at the time of the crash would likely have been between 0.1248 and 0.1556, a level consistent with

11.

impairment.  She explained that alcohol impairs a person's ability to divide attention and to pay attention to the road and surrounding activities.  It also slows reaction time.

### G.  The accident report is prepared.

{¶ 31} Trooper Kiefer authored the crash report.  He described some of the physical road evidence observed at the crash scene, including skid and yaw marks.  He explained that a skid mark is a dark area in the road made by the force of a vehicle coming to a straightforward stop.  A yaw mark occurs when the car is moving faster than the vehicle can handle and "yaw[s] around in a circular motion."

{¶ 32} Trooper Kiefer and Sergeant Lawson both testified that there were two crashes here.  The first crash occurred when the Cadillac hit the wall and became disabled in the left lane of the highway.  The fluid and skid marks indicate that the Cadillac veered off the road, struck the concrete median wall, spun around, and came to final rest in the left lane.  The Ford then came along and rear-ended the Cadillac, forcing it further ahead into the right lane.  The occupants of the Cadillac were not in the vehicle at the time of the second impact.  The Toyota was traveling northbound and attempted to veer away from the debris from the first collision, but became involved in the crash.  The Toyota ended up alongside the concrete highway barrier, and the front of the Ford was rammed into the driver's side of the Toyota.  Trooper Kiefer did not know whether all occupants of the vehicles wore seatbelts or whether all air bags were deployed in all three of the vehicles involved.  He observed that some air bags were deployed.

{¶ 33} Trooper Kiefer noted in his report factors that contributed to the accident.  As to both the Ford and the Toyota, he indicated in the report that they were following

12.

too closely—i.e., they failed to maintain an assured clear safe distance. He also checked the distracted driving box, however it was unknown whether B.H. had been distracted. Other than the fact that B.H. collided with Quinn's vehicle, there were no other indicators that she had failed to maintain an assured clear distance. Trooper Kiefer explained that this notation is made regardless of whether the driver had the opportunity to see, detect, or perceive a disabled vehicle in the roadway. B.H. was not wearing a seatbelt.

{¶ 34} Neither Trooper Kiefer nor Sergeant Lawson knew whether Kinney ever tried to restart the Cadillac to try to move it out of the road or whether she ever had the keys to the vehicle. Sergeant Lawson did not know if Kinney ever had her foot on the gas pedal or the brake pedal. He did not believe that Kinney was ever in the driver's seat. Sergeant Lawson testified that there was no evidence that Quinn or Kinney attempted to call 9-1-1 to report that their vehicle was disabled in the middle of the roadway.

{¶ 35} Sergeant Lawson testified that Kinney and Quinn's cellphones were seized, but they were not analyzed to determine whether they were texting at the time of the accident. B.H.'s phone was not collected as evidence, so there is no way to know whether she may have been texting or talking on her phone at the time of the accident. The investigation produced no evidence of distracted driving by the drivers of the Ford or the Toyota. Testing performed at autopsy indicated that B.H. had Benadryl, oxycodone, and oxymorphone in her blood that she had metabolized for some time. Dr. Blomquist acknowledged that these drugs could reduce reaction time, but he also said that individuals have significant variations in tolerance to these drugs.

13.

## H. An accident reconstructionist renders conclusions.

{¶ 36} Trooper Kyle Baxter works in the crash reconstruction unit of the Ohio State Highway Patrol. He was contacted about this crash the day after it occurred. He reviewed the crash report, pertinent safety-recall information, photos of the scene and the vehicles, and the vehicles' event data recorders ("EDRs"). He prepared a reconstruction report documenting his findings. Trooper Baxter concluded that the crash that began the entire sequence of events was the Cadillac colliding with the center dividing wall.

{¶ 37} As part of his analysis, Trooper Baxter checked for open recalls on all three vehicles. The Ford had two active recalls—one relating to door latch issues and the other relating to leakage of brake fluid—but he saw nothing to suggest that those recalls played any role in the collisions. There were no active recalls for the Cadillac or Toyota.

{¶ 38} Trooper Baxter observed tire marks traveling toward the left shoulder of the road and damage to the concrete wall. These marks indicate that the Cadillac veered off the road and struck the concrete barrier. Puddling of fluid in the road shows that it came to a final rest in the middle of the left lane of the roadway. It remained there until it was struck by the Ford. Gouging in the roadway north of the puddle of fluid is consistent with the underbody of the vehicle coming into contact with the asphalt. Gouging like that typically results from the interaction of two vehicles, forcing a vehicle downward onto the roadway.

{¶ 39} Trooper Baxter was able to retrieve information from the vehicles' EDRs. The EDR is powered by the vehicle's battery or electrical system, so it is not capable of recording when the vehicle is turned off. The EDR would not provide information

14.

concerning how much time passed between when the Cadillac became disabled and when it was struck by the Ford or indicate when the Ford was struck by the Toyota. There was no data concerning movement of the Cadillac's steering wheel, and he did not recall the data regarding seatbelt use or whether every air bag in every vehicle deployed. There was no evidence of the EDR malfunctioning.

{¶ 40} Trooper Baxter explained that a vehicle's EDR makes the decision—within milliseconds—whether to deploy the vehicle's airbags. The EDR may save information for deployment versus non-deployment events. The EDR in the Cadillac noted a deployment event and a non-deployment event that were 0.04 seconds apart, indicating that they resulted from the same event. The deployment event was the collision with the concrete barrier. The vehicle's EDR indicated that the Cadillac was traveling 83 miles per hour before it veered off the road and slammed into the wall, 13 miles per hour above the 70-mile-per-hour speed limit. The EDR report does not contain information concerning whether the Cadillac's hazard lights, taillights, or other source of illumination was on. Trooper Baxter acknowledged that at night, it can be very dangerous for a non-illuminated vehicle to be disabled in a lane of travel, and even more so the higher the speed limit.

{¶ 41} The EDR report indicates that the Ford was travelling between 69 and 71 miles per hour at the time of the collision, but because its tires were a little too big for the vehicle, the speed was more likely 71 to 73 miles per hour. The EDR suggests that cruise control was set because it detected no pressure on the accelerator. The EDR shows that the decedent applied the brakes a half-second before impact, but it was not a hard brake.

15.

The speed as the brakes were applied was reported as 41.5 miles per hour. Trooper Baxter explained that research and testing demonstrates that it takes roughly 1.5 seconds from the time that a person perceives a possible threat and the time for the brain to process what the person is seeing and to make a cognitive decision to do something in reaction to that perceived threat. The fact that the threat here occurred at night and the Cadillac was a dark color—gray—and was not illuminated would affect the ability to perceive the threat. At 70 miles an hour, a vehicle travels about 100 feet per second. At that speed, a vehicle would travel about 150 feet in a second and a half.

{¶ 42} Before impact, the Toyota was traveling 75 miles per hour. The driver swerved to avoid debris or the vehicles, spun, and ended up facing the opposite direction when it became pinned against the wall. The brakes were applied two seconds before impact, and half a second after the brakes were applied, the EDR detected a speed of 59.7 miles per hour.

{¶ 43} Based on his evaluation and analysis, Trooper Baxter found that there was one vehicle involved in the first crash—the Cadillac SUV, occupied by Quinn and Kinney—and three vehicles involved in the second crash—the Cadillac, the Ford, and the Toyota. The Ford had one occupant, and the Toyota had four occupants.

## I. The jury convicts Quinn and Kinney.

{¶ 44} The jury found both Quinn and Kinney guilty on all counts. As to Quinn, Counts 1 and 2 merged for purposes of sentencing and the State elected to have her sentenced on Count 1. The court imposed a prison term of six to nine years. It sentenced her to a term of 180 days on Count 3, 365 days on Count 4, and 180 days on Count 5, all

16.

to be served concurrently to the term imposed on Count 1.  Quinn appealed.  She assigns

the following errors for our review:

> I.    APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR
> TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS
> WHEN THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE
> THAT HER ACTIONS WERE THE PROXIMATE CAUSE OF THE
> ACCIDENT THAT RESULTED IN A LOSS OF LIFE AND HER
> CONVICTION FOR AGGRAVATED VEHICULAR HOMICIDE.
>
> II.    APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
> COUNSEL UNDER THE OHIO AND FEDERAL CONSTITUTIONS.

## II.  Law and Analysis

{¶ 45} Quinn challenges the sufficiency of the evidence with respect to her

convictions on Counts 1 and 2.  She also claims that trial counsel was ineffective for (1)

stipulating to prior OVI convictions, (2) failing to request additional jury instructions, and

(3) failing to object to improper statements made by the State's attorney during closing

argument.

## A.  Sufficiency

{¶ 46} In her first assignment of error, Quinn argues that her convictions for

aggravated vehicular homicide are not supported by sufficient evidence because (1) as to

her conviction under R.C. 2903.06(A)(1)(a), the State failed to prove that her conduct

was the proximate cause of the accident, and (2) as to her conviction under R.C.

2903.06(A)(2)(a), there was no evidence that she operated the vehicle recklessly.

{¶ 47} Whether there is sufficient evidence to support a conviction is a question of

law.  *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).  In reviewing a challenge to the

sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a

17.

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 48} Under R.C. 2903.06(A)(1)(a), "[n]o person, while operating or participating in the operation of a motor vehicle . . . shall cause the death of another . . . [a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code[.]" Quinn concedes that it may have been reasonably foreseeable that operating a motor vehicle while under the influence of alcohol might result in death or physical harm to another, but she insists that it was not *her* conduct that caused the accident here. Rather, she claims, it was Kinney's unforeseeable act of grabbing the steering wheel that caused her to lose control of the vehicle. She maintains that there was no evidence to suggest that if she had been sober, she would have been able to recover control of the vehicle and prevent the accidents that followed. She highlights Trooper Baxter's testimony that upon encountering a threat, it takes 1.5 seconds for the ordinary person to perceive, process, and take action in response. Quinn insists that in this regard, she was as powerless to avoid the first crash as B.H. was to avoid the second.

18.

{¶ 49} Under R. C. 2903.06(A)(2)(a), "[n]o person, while operating or participating in the operation of a motor vehicle . . . shall cause the death of another . . . [r]ecklessly[.]" Quinn submits that there is nothing in the record to support a finding that she operated her vehicle recklessly. She acknowledges that the State argued in its closing that the act of driving under the influence of alcohol was reckless in and of itself, but Quinn reiterates her position that *her* conduct did not proximately cause the accidents here. Quinn also addresses the State's claim in closing that she would have been able to prevent the crash if she had not been recklessly gripping the steering wheel too loosely, but she maintains that this argument was merely speculative and was not supported by any evidence.

{¶ 50} The State responds that aggravated vehicular homicide under R.C. 2903.06(A)(1)(a) is a strict-liability offense. It maintains that although Quinn may not have foreseen the precise injuries that resulted, the events that occurred were a logical result of her actions. It claims that "a motorist crashing into a car that was abandoned in a lane of travel after that car collided with a roadway wall by a driver who was under the influence of alcohol cannot be said to be completely unforeseen." The State urges that this court need not consider the sufficiency of Quinn's conviction under R. C. 2903.06(A)(2)(a) because Quinn was not sentenced for that offense.

{¶ 51} First, that R.C. 2903.06(A)(1)(a) is a strict liability offense negates the State's burden of proving a mens rea—it does not relieve the State of its burden to present sufficient evidence of each element of the offense. In this case, it was required to present evidence that (1) Quinn was operating or participating in the operation of a motor

19.

vehicle; (2) her operation of the motor vehicle caused a person's death; (3) she committed a violation of R.C. 4511.19(A); and (4) the victim's death proximately resulted from Quinn's violation of R.C. 4511.19(A).

{¶ 52} Second, the State mischaracterizes Quinn's argument, which it paraphrases as follows: "The specific argument raised by Quinn's first assignment of error is that her conviction was supported (sic) by sufficient evidence because an aggravated vehicular homicide was unforeseeable given her conduct of driving drunk and crashing her car." In fact, the crux of Quinn's argument is that the State failed to present evidence that the victim's death proximately resulted from *her* operation of the vehicle in violation of R.C. 4511.19(A). She claims only that it was not foreseeable that her passenger would grab the steering wheel, and *this* is the act that began the fatal sequence of events—not her violation of R.C. 4511.19(A). The State did not directly address Quinn's actual argument. Nevertheless, we find that the State did present evidence from which a rational trier of fact could find that Quinn's violation of R.C. 4511.19(A) caused the crash that led to B.H.'s death.

{¶ 53} The State presented evidence that Quinn's BAC was .094 four hours after the crash; reverse-extrapolation suggests that it was between 0.1248 and 0.1556 at the time of the crash; a BAC of this level depresses the central nervous system and impairs a person's ability to divide attention and to pay attention to the road and surrounding activities; two of the most common traffic violations that impaired people commit are speed and marked lanes violations; Quinn was driving 83 miles per hour in a 70-mile-per-hour zone; and the EDR shows that Quinn did not apply the brakes before crashing into 20.

the wall.  The State also presented evidence that it takes the brain approximately 1.5 seconds to react to a threat, but alcohol impairment slows decision-making, decreases reaction time, and inhibits gross- and fine-motor functioning.

{¶ 54} Ohio courts recognize the general rule that "a defendant's conduct is the proximate cause of injury or death to another if the defendant's conduct (1) is a 'substantial factor' in bringing about the harm and (2) there is no other rule of law relieving the defendant of liability."  *State v. Filchock*, 2006-Ohio-2242, ¶ 77 (11th Dist.), quoting *State v. Flanek*, 1993 WL 335601, *6 (8th Dist. Sept. 2, 1993).  "Further, 'a defendant will not escape liability merely because factors other than his own acts contributed to the death, so long as those factors were not the sole cause.'"  *State v. Naylor*, 2024-Ohio-1648, ¶ 51 (11th Dist.), quoting *State v. Lennox*, 2011-Ohio-5103, ¶ 23 (11th Dist.).

{¶ 55} Quinn does not necessarily disagree that the conduct of two actors may both be substantial factors in bringing about harm, but she does dispute that the State presented evidence that *her* conduct was a substantial factor because it did not present evidence that her impairment by alcohol was a cause of the crash.  We considered a similar issue in *State v. Moore*, 2019-Ohio-3705 (6th Dist.).  There, we found that there was no evidence in the record that defendant's act of driving with a prohibited concentration of cocaine in her blood was the direct cause of the victim's death, without which his death would not have occurred.  We observed that the State had furnished no evidence regarding the potential effects that a prohibited concentration of cocaine in a person's blood would have on his or her ability to operate a vehicle.  We concluded that

21.

without such evidence, it failed to prove that the victim's death proximately resulted from the defendant driving with a prohibited concentration of cocaine in her blood.

{¶ 56} Here, however, the State did present evidence regarding the effects that alcohol impairment have on the ability to operate a vehicle. As summarized above, it offered evidence that alcohol depresses the central nervous system and impairs a person's ability to divide attention and to pay attention to the road and surrounding activities; that impaired drivers most commonly commit speed and marked lanes violations; it takes the brain approximately 1.5 seconds to react to a threat; and alcohol impairment slows decision-making, decreases reaction time, and inhibits gross- and fine-motor functioning. Given this evidence, a reasonable juror could have concluded that although Kinney is the one who jerked the steering wheel, Quinn's impairment was nevertheless a substantial cause of the accident. The State presented sufficient evidence in support of Count 1.

{¶ 57} As to Count 2, the State argues that if we find sufficient evidence to support Quinn's conviction of Count 1, we need not address the sufficiency of the evidence in support of Count 2 because any error would be harmless. We agree that we need not review the sufficiency of the evidence in support of Count 2, but not for the reason urged by the State. Rather, we reach this conclusion because there has not been a "conviction" of Count 2.

{¶ 58} As Judge Zmuda explained in his dissenting opinion in *State v. Horn,* 2023-Ohio-138 (6th Dist.), the Ohio Supreme Court, in *State v. Whitfield,* 2010-Ohio-2, held that a "conviction" includes both a guilty verdict and a sentence. *Horn* at ¶ 62 (Zmuda, J., dissenting), citing *Whitfield* at ¶ 12. Therefore, if a guilty verdict is merged with

22.

another count for purposes of sentencing pursuant to R.C. 2941.25, that guilty verdict remains unsentenced and does not constitute a "conviction" subject to appellate review. *Id.,* citing *State v. Worley,* 2016-Ohio-2722, ¶ 23 (8th Dist.). Put simply, in cases where separate counts are merged and the state elects the count on which the trial court will impose sentence, only the count that includes both a guilty verdict and sentence is subject to this court's review. *Id.* As such, we need not examine the sufficiency of the evidence in support of Count 2.

{¶ 59} We find Quinn's first assignment of error not well-taken.

### B. Ineffective Assistance of Counsel

{¶ 60} In her second assignment of error, Quinn argues that trial counsel was ineffective in three respects: (1) agreeing to a stipulation, provided to the jury, disclosing that she had two prior OVI convictions; (2) failing to request additional jury instructions on the issue of causation; and (3) failing to object to comments made by the State's attorney during closing, indicating the State's belief that Quinn was guilty.

{¶ 61} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-23.

3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 62} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 63} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 2005-Ohio-3775, ¶ 8 (11th Dist.), quoting *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160 (4th Dist. 1988).

{¶ 64} We address Quinn's three different claims of ineffective assistance of counsel.

24.

### 1. The Stipulation

{¶ 65} Quinn was charged with OVI under R.C. 4511.19(A)(1)(a). The indictment alleged a sentencing enhancement under R.C. 4511.19(G)(1)(c) because Quinn had two prior OVIs within the previous ten years. Apparently believing that the existence of these prior OVIs was an element of the offense, the State proposed that defense counsel enter into a stipulation that would relieve the State of the burden of proving that element, and dispensing with the need to "admit[] the full packet of driving history and certified priors and things like that from Toledo Muni Court." Defense counsel agreed. The stipulation was admitted as evidence, read to the jury, and was the subject of witness testimony.

{¶ 66} Before deliberations, the trial court instructed the jury:

> The parties have stipulated regarding defendant Ivory Quinn's prior convictions. That evidence was received because a prior conviction is an additional finding as to an offense that was charged. It was not received, and you may not consider it, to prove the character of the Defendant in order to show that she acted in conformity or in accordance with that character.

{¶ 67} During its closing, the State told the jury:

> Now, your instructions also indicate that Defendant Quinn is further charged in that count with having two prior OVI convictions within a ten-year period and the parties have stipulated to and agreed to that fact. That is an additional finding that you must make, as the Judge instructed you. But, again, Defendant Quinn has stipulated and agrees that within ten years of this crash she has previously been convicted of two violations of operating a vehicle under the influence.

{¶ 68} After the jury rendered its verdict of guilty, the trial court spoke to counsel.

> THE COURT: It was fully my intent to go ahead with sentencing tonight. I may plan to do that. But I need to talk to you about an issue that I don't think any of us picked up on and I'm really concerned about it. On the OVI for Miss Quinn we included her priors. It's a misdemeanor. We were not

supposed to include in any way mention of those priors. I didn't pick up on it until just now. You guys stipulated. It's not a finding. It is not a finding on a misdemeanor of the first degree. It's not an element. It's not part of the offense.

[THE STATE]: Do you mean putting in the case number?

THE COURT: Putting in the fact that she had a prior OVI. It's not even supposed to be in there. The fact that you stipulated to it, I didn't think about it.

[THE STATE]: In where? I'm sorry. Where was it not supposed to be?

THE COURT: As mentioned even. It's a misdemeanor. As misdemeanors, those are not elements of the offense.

[THE STATE]: The priors.

THE COURT: The priors are not elements of the offense. I completely missed it.

[THE STATE]: Doesn't it enhance the misdemeanor? It's a third OVI.

THE COURT: It gets a higher penalty but it's still a misdemeanor. As a misdemeanor, misdemeanors never have prior offenses. I should have seen it. I missed it.

[QUINN'S ATTORNEY]: We all did.

[THE STATE]: So it's not an element.

THE COURT: No, it's not an element of the offense.

[THE STATE]: Well, you have the instruction, Judge, that they are not to consider that for character evidence or conformity therewith. So I don't think it matters, in the State's view, for their findings if they followed that instruction.

THE COURT: Here is what I'm going to do. I'm going to set this for sentencing on Tuesday. I'm going to set bond at $250,000 on each one of them. They'll be held in the justice center until Tuesday. We need to figure out if we've got a problem. . . . But I'm telling you, you need to look into this and find out if you need to file something ahead of time. I don't know

26.

if the fact that you stipulated to it what that does or doesn't do.  So I just want to tell you.

. . .

[THE STATE]:  That's an issue with our Matrix system because Matrix is putting it in as like a specification, an additional finding.

THE COURT:  It shouldn't have.

[THE STATE]:  And so that's where we are.

THE COURT:  I should have seen this.  I know this.  This is basic stuff.  I should have known and I missed it.

[THE STATE]:  I'm fine with just doing bond tonight, Judge.

THE COURT:  That's what I'll do because I don't feel comfortable.

{¶ 69} Quinn's trial attorney filed the following in response to the Court's

instruction to brief the issue:

> Quinn now asks this Court to order a new trial for her pursuant to ORC 2945.79 and Ohio Crim. R. 33.
>
> Specifically, evidence was presented to the jury through testimony and by way of stipulation between the State of Ohio and Quinn.  The stipulation contained inaccurate information which was damaging to Quinn and led to witness testimony which should not have been presented to the jury.  Had this information not been presented to the jury a different outcome might have occurred.  For the foregoing reasons, Quinn asks this Court to order a new trial.

The State opposed the motion, arguing that the trial court's limiting instruction to the jury

was sufficient, and insisting that the outcome of the trial would have been no different

because of the overwhelming evidence against Quinn.

{¶ 70} At the beginning of the sentencing hearing, the trial court denied Quinn's

motion.  It reasoned that (1) Quinn stipulated to the evidence; (2) the court gave a

27.

limiting instruction; and (3) there was overwhelming evidence that Quinn was under the influence of alcohol.

{¶ 71} Quinn argues on appeal that counsel was ineffective for entering into this stipulation because her prior OVI convictions were relevant only to sentencing and not to prove the OVI charge. She maintains that there was no legitimate trial strategy that would have excused counsel's performance in stipulating to this irrelevant, highly-prejudicial evidence. She insists that it cannot be said with confidence that the outcome of the trial would have been different.

{¶ 72} The State concedes that the evidence was not required to prove any element of the offenses charged, but claims that it was still, somehow, trial strategy to stipulate to its admission. It maintains that Quinn suffered no unfair prejudice because there was overwhelming evidence of her guilt, and the outcome of the trial would not have been different.

{¶ 73} In *State v. Allen,* 29 Ohio St.3d 53, 55 (1987), the Ohio Supreme Court held that when a prior conviction does not affect the degree of the offense, but serves only to enhance the penalty, the prior conviction is not an element of the offense. Like the present case, *Allen* involved a conviction under R.C. 4511.19(A)(1)(a). The defendant stipulated to prior OVI convictions, but objected to the stipulation being read to the jury. The trial court determined that the prior OVIs were an element of the offense and disclosed the stipulation to the jury. The Ohio Supreme Court concluded that this was error. Although the trial court instructed the jury not to consider the stipulation for purposes of determining the defendant's guilt on the charge before it, the Court concluded

28.

that the error in admitting the stipulation was reversible because the "inflammatory fact" of the defendant's prior convictions had the "undeniable effect" of "incit[ing] the jury to convict based on past misconduct rather than restrict their attention to the offense at hand." *Id.*

{¶ 74} It cannot be credibly argued that it was trial strategy for defense counsel to stipulate to the admissibility of her prior OVI convictions. First, the evidence was not a required element of any offense charged. Second, it was highly prejudicial. And third, it was clear that counsel was simply unaware that the existence of the prior OVIs was not an element of any offense charged. As the trial court observed, "[t]his is basic stuff."

{¶ 75} Nevertheless, we cannot say here that there is a reasonable probability that the outcome of the trial would have been different if the prior OVIs had not been admitted. The State presented overwhelming evidence of Quinn's impairment and its role in causing the accident. It presented evidence that her BAC was .094 four hours after the crash; her BAC was in the range of 0.1248 to 0.1556 at the time of the crash; a BAC of this level depresses the central nervous system and impairs a person's ability to divide attention and to pay attention to the road and surrounding activities; two of the most common traffic violations that impaired people commit are speed and marked lanes violations; Quinn was driving 83 miles per hour in a 70-mile-per-hour zone; and the EDR shows that Quinn did not apply the brakes before crashing into the wall. The State also presented evidence that it takes the brain approximately 1.5 seconds to react to a threat, but alcohol impairment slows decision-making, decreases reaction time, and inhibits gross- and fine-motor functioning. Given this evidence, we cannot say that there is a

29.

reasonable probability that the outcome of the trial would have been different had defense counsel not stipulated to the admission of Quinn's prior OVI convictions.

## 2. The Jury Instructions

{¶ 76} Quinn acknowledges that with respect to Counts 1 and 2, the jury instructions were taken from Ohio Jury Instructions ("OJI"). She maintains, however, that the instructions regarding "cause" were insufficient to apprise the jury as to how they should consider Kinney's role in the case. She argues that the following additional instruction would have given the jury "a better perspective on Quinn's conduct vis-a-vis Kinney's":

> Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred "but for" the conduct. Second, when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable. LaFave & Scott, Criminal Law (1972), 246, § 35.

{¶ 77} Quinn insists that this instruction is an accurate statement of the law, was relevant to the evidence adduced, and would have aided the jury in its deliberations. She claims that if requested, the court would have been duty-bound to give this instruction. Quinn contends that there was no sound strategic reason not to advocate for this instruction. She further contends that the State's "unfettered remarks" regarding B.H.'s failure to wear a seatbelt and Kinney's conduct in grabbing the steering wheel "would have been reigned in had the court settled upon that instruction." She maintains that absent this instruction, "the jury was left with little choice but to find Quinn guilty."

30.

**{¶ 78}** The State emphasizes Quinn's acknowledgment that the jury instructions were accurate, and claims that it could find no Ohio decision utilizing this provision of LaFave and Scott to craft a jury instruction. It maintains that courts have found that the failure to request a jury instruction as to causation has been determined to not constitute deficient performance, and it insists that even if the instructions had been requested and given, it would not have affected the outcome of the proceedings because there was overwhelming evidence of Quinn's guilt.

**{¶ 79}** "Juries are entitled to 'all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. Wilson*, 2024-Ohio-776, ¶ 28, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Generally, the failure to request a particular jury instruction is considered a matter of trial strategy that will not support a claim of ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 47 (1980). "Simply because there was 'another and better strategy available' [does] not mean that counsel provided ineffective assistance." *State v. Mohamed*, 2017-Ohio-7468, ¶ 19, quoting *Clayton* at 49.

**{¶ 80}** Here, with respect to causation, the trial court instructed the jury as follows:

> Cause. The State charges that the acts of the Defendants caused a death. Cause is an act or a failure to act that . . . in a natural and continuous sequence directly produces the death and without which it would not have occurred.
>
> A Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act. A Defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act. There may be one or more causes

of an event. However, if a defendant's act was one cause, then the existence of other causes is not a defense.

A Defendant is responsible for the natural consequences of that Defendant's unlawful act, even though death was also caused by an intervening act or failure to act of another person.

{¶ 81} Quinn concedes that the instruction provided by the court was taken from OJI and is accurate. The instruction she proposes, however, is somewhat misleading in that it suggests that there can be only *one* proximate cause of a person's death when, in fact, "there can be more than one proximate cause of a particular injury." *State v. Theuring*, 46 Ohio App.3d 152, 154 (1st Dist. 1988).

{¶ 82} Furthermore, the substance of the instruction Quinn claims should have been requested is contained in the instruction that was given. The jury was instructed that (1) "[c]ause is an act or a failure to act that . . . in a natural and continuous sequence directly produces the death and without which"—i.e., *but for*—"it would not have occurred"; and (2) she is "responsible for the natural and foreseeable"—i.e., not surprising—"consequences or results that follow in the ordinary"—i.e., not extraordinary—"course of events." Clearly, the instruction that Quinn claims her attorney should have requested is worded more favorably to her position, however, the substance of that instruction was provided here. *See State v. Dixon*, 2002-Ohio-541, ¶ 9 (2d Dist.) (finding no error in trial court's refusal to give defendant's requested instruction where "general charge to the jury was correct and sufficient to convey the substance of" the requested instruction). We find that trial counsel was not ineffective for failing to request the LaFave and Scott instruction.

32.

### 3. Closing Arguments

{¶ 83} Quinn acknowledges that prosecutors are given wide latitude in closing arguments, but she claims that the State's attorney improperly expressed personal opinions as to her guilt when it said to the jury:

> When you go back to that jury room and begin the very important task of deliberating to a verdict, the State of Ohio is asking you to return a verdict that does justice for [B.H] and her family. We are confident you will come to the same conclusion the State of Ohio has reached, and that is that Sonya Kinney and Ivory Quinn are guilty of each and every charged offense. Thank you.

{¶ 84} Quinn insists that the State's statement was even more egregious here because it used the collective "we," potentially indicating to the jury that all the people the State purports to represent—including its attorneys, the State's witnesses, and the sovereign itself — believe she is guilty. Although Quinn concedes that in isolation, this statement was not enough to deprive her of a fair trial, she claims that defense counsel's failure to object to this statement *combined with* other unprofessional errors, worked to deprive her of a fair trial. She claims that there was no sound strategic reason to allow the statement to go unchallenged, and she maintains that she was prejudiced as a result.

{¶ 85} The State responds that the decision to refrain from objecting during closing argument falls within the ambit of trial strategy. It insists that speaking in the collective here wasn't vouching and will not automatically be deemed improper.

{¶ 86} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Nevertheless, courts often deem it trial strategy

33.

whether to object to improper statements during closing arguments. *See State v. Herns*, 2023-Ohio-4714, ¶ 85 (7th Dist.), citing *State v. Mundt*, 2007-Ohio-4836, ¶ 90 ("A failure to object during closing arguments is frequently part of trial strategy."). And here, Quinn concedes that in isolation, this statement was not sufficient to deprive her of a fair trial. Accordingly, we find that the failure to object to this statement during closing argument did not deprive Quinn of effective assistance of counsel.

{¶ 87} We find Quinn's second assignment of error not well-taken.

### III. Conclusion

{¶ 88} The State presented sufficient evidence regarding Quinn's alcohol impairment and its effect on her ability to operate a vehicle. Given this evidence, a reasonable juror could have concluded that although Kinney is the one who jerked the steering wheel, Quinn's impairment was nevertheless a substantial cause of the accident, and the victim's death proximately resulted from her violation of R.C. 4511.19(A). Quinn's first assignment of error is not well-taken.

{¶ 89} We find that counsel's performance fell below an objective standard of reasonable representation when he stipulated to the admissibility of Quinn's prior OVI convictions, however, we find that there was not a reasonable probability that the outcome of the proceedings would have been different but for counsel's error. We find that counsel was not ineffective for failing to request an additional jury instruction or for failing to object to an isolated improper statement by the State during closing argument. Quinn's second assignment of error is not well-taken.

34.

**{¶ 90}** We affirm the January 29, 2024 judgment of the Wood County Court of

Common Pleas.  Quinn is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.